UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JOSALIEN PROFETE,
     Petitioner,

vs.                         Case No.:  3:19cv554/LAC/EMT

MARK S. INCH,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

Petitioner Josalien Profete (Profete) filed an amended petition for writ of habeas corpus under 28 U.S.C. § 2254, and a supporting memorandum (ECF Nos. 17, 18).  Respondent (the State) filed an answer and relevant portions of the state court record (ECF Nos. 29, 31).  The court provided Profete an opportunity to file a reply (*see* ECF No. 30), but he has not done so as of the date of this Report and Recommendation.

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of the issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is

further the opinion of the undersigned that the pleadings and attachments before the

court show that Profete is not entitled to habeas relief.

I.      RELEVANT BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established

by the state court record (*see* ECF No. 31).[1]  Profete was charged in the Circuit Court

in and for Escambia County, Florida, Case No. 2014-CF-2937, with three counts of

sexual battery of a child while in a position of familial or custodial authority (Counts

1–3); one count of lewd or lascivious molestation (victim 12 years of age or older

but less than 16 years of age) (Count 4); one count of lewd or lascivious exhibition

in the presence of a minor (victim less than 16 years of age) (Count 5); one count of

battery of a child by throwing, tossing, projecting, or expelling seminal fluid (Count

6); and one count of transmitting or showing obscene material to a minor (Count 7)

(App. A at 16–19).  On April 23, 2015, a jury found Profete guilty as charged on all

counts (App. A at 83–84 (verdict), App. B (trial transcript)).  The court sentenced

Profete as a sexual offender to a total term of forty-five years in prison followed by

a total term of fifteen years of probation, with presentence credit of 326 days (App.

A at 213–57 (sentencing transcript), App. A at 271–79 (Order of Judgment and

---

[1] Citations to the state court record refer to the exhibits filed by the State (*see* ECF No. 31).  If a cited page has more than one page number, the court refers to the "Bates stamp" page number at the very bottom of the page.

Sentence), App. D at 295–303 (Amended Order of Judgment and Sentence)).  The court subsequently entered an order declaring Profete a sexual predator (App. L).

Profete appealed the judgment to the Florida First District Court of Appeal (First DCA), Case No. 1D15-3212 (App. E).  The First DCA affirmed the judgment per curiam without written opinion on May 31, 2016 (App. H).  *Profete v. State*, 191 So. 3d 465 (Fla. 1st DCA 2016) (Table).  The mandate issued June 16, 2016 (App. I).

On June 2, 2017, Profete filed a motion for post-conviction relief in the state circuit court, under Rule 3.850 of the Florida Rules of Criminal Procedure (App. M at 9–111).  The circuit court summarily denied the Rule 3.850 motion on September 26, 2017 (App. M at 112–309).  Profete appealed the decision to the First DCA, Case No. 1D17-4851 (App. N).  The First DCA affirmed the circuit court's decision per curiam without written opinion on December 11, 2018 (App. O).  *Profete v. State*, 259 So. 3d 77 (Fla. 1st DCA 2018) (Table).  The mandate issued January 8, 2019 (App. P).

Profete filed the instant federal habeas action on April 2, 2019 (ECF No. 1), and thereafter filed an amended petition (ECF No. 17).

## II.    STANDARD OF REVIEW

A federal court "shall not" grant a habeas corpus petition on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[2]  Justice O'Connor described the appropriate test:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Under the *Williams* framework, the federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its

---

[2] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).  After identifying the governing legal principle, the federal court determines whether the state court's adjudication is contrary to the clearly established Supreme Court case law.  The adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases.  *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court.  *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004).  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State

court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). "The question under AEDPA [the Antiterrorism and Effective Death Penalty Act of 1996] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). AEDPA also requires federal courts to "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Landrigan*, 550 U.S. at 473–74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has often emphasized that a state prisoner's burden under § 2254(d) is "difficult to meet, . . . because it was meant to be." *Richter*, 562 U.S. at 102. The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state

proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L. Ed. 2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no further.  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.  *Jackson v. Virginia*, 443 U.S. 307, 332, n.5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 102–03 (emphasis added).

A federal court may conduct an independent review of the merits of a petitioner's claim only if it first finds that the petitioner satisfied § 2254(d).  *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007).  Even then, the petitioner must show that he is in custody "in violation of the Constitution or laws and treaties of the United States," *see* 28 U.S.C. § 2254(a), and that the constitutional error resulted in "actual prejudice," meaning, the error "had a substantial and injurious effect or influence in determining the jury's verdict," *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks and citation omitted).

## III.  PROFETE'S CLAIMS

**A.  Ground One:  "The trial court erred in admitting the C.P.T. interview on grounds that the 'taint' from the impermissible interview by the mother had dissipated due to time and space."**

Profete contends the trial court erred by admitting hearsay statements of the child victim, E.B., made during a videotaped interview with Aayana McCreary, a member of the Child Protection Team (CPT) (ECF No. 17 at 6; ECF No. 18 at 2–6).[3]  Profete contends E.B.'s statements during the CPT interview were "tainted" by prior questioning by E.B.'s mother, Vione Bain.  Profete contends the trial court ruled that E.B.'s hearsay statements during the mother's questioning were inadmissible under Rule 90.803(23) of the Florida Rules of Evidence, because they were unreliable.  Profete contends once the court found that those hearsay statements were unreliable, the court should have made the same unreliability finding as to E.B.'s hearsay statements during the subsequent videotaped CPT interview.  Profete contends under Fourth Amendment precedent (specifically, *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920), *Wong Sun v. United States*, 371 U.S. 471 (1963), and *Brown v. Illinois*, 422 U.S. 590 (1975)), the "derivative" statements (i.e., E.B.'s statements during the CPT interview) were not purged of the "primary taint" of the mother's questioning; therefore, the trial court should not have admitted E.B.'s

---

[3]  Citations to the parties' pleadings refer to the page numbers automatically assigned by the court's electronic filing system.

statements during the CPT interview. Profete asserts he exhausted Ground One by presenting it to the First DCA on direct appeal (ECF No. 17 at 6).

The State asserts an exhaustion defense (ECF No. 29 at 17–26). The State contends although Profete presented the federal nature of his claim to the First DCA on direct appeal, he did not present a federal claim to the trial court and instead argued only that E.B.'s hearsay statements during the CPT interview were inadmissible under Fla. Stat. § 90.803(23). The State contends because Profete did not fairly present his federal claim in each appropriate state court, he did not satisfy the exhaustion requirement. The State notes that even if Profete exhausted his federal claim, it fails on the merits, because the initial "taint" was not the fruit of conduct by a state actor, so Fourth Amendment precedent did not apply (*id.* at 26 n.2).

### 1. Exhaustion

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner exhaust available state court remedies, *see* 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim

in each appropriate state court, alerting that court to the federal nature of the claim. *Duncan*, 513 U.S. at 365–66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard*, 404 U.S. at 277–78.

In Profete's direct appeal, he presented the same claim he presents in Ground One of his amended § 2254 petition, i.e., the trial court failed to analyze the admissibility of E.B.'s hearsay statements during the CPT interview in the context of the Fourth Amendment (*see* App. E at 16–18).  Profete argued that the Fourth Amendment context required the court to determine whether the "taint" of the mother's questioning was "purged" by the time of the CPT interview (*id.*).  In its answer brief, the State conceded the issue was preserved for appeal (*see* App. F at 6).  The First DCA rejected Profete's federal claim on the merits in an unexplained affirmance of the trial court's ruling.

When a state court issues an order that summarily rejects without discussion all the claims raised by a defendant, including a federal claim that the defendant subsequently presses in a federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits in the absence of any indication or state law procedural principles to the contrary.  *See Richter*, 562 U.S. at 99.  The presumption may be overcome when there is a reason

to think some other explanation for the state court's decision is more likely. *Id.* at 99–100.

Here, there is no reason to think that the First DCA rejected Profete's federal claim on any ground other than the merits (for example, lack of preservation in the trial court). For these reasons, the court rejects the State's exhaustion defense. Because Profete presented his federal claim to the First DCA, and that court adjudicated the merits, Profete satisfied the exhaustion requirement.

### 2.    Review Under § 2254(d)

Having determined that Profete exhausted Ground One, the court must determine whether he has demonstrated that the state court's adjudication of the claim was based upon an unreasonable determination of fact, or that it was contrary to or an unreasonable application of clearly established federal law.

Prior to Profete's trial, the State filed a notice of intent to offer statements qualifying as hearsay under Fla. Stat. § 90.803(23) (*see* App. A at 32–34). The State sought to offer E.B.'s hearsay statements during her mother's questioning, and E.B.'s hearsay statements during the videotaped CPT interview. The defense opposed admission of the hearsay statements, so the trial court held an evidentiary hearing on March 26, 2015 (*see id.* at 35–69). Ms. Bain (E.B.'s mother) and Ms. McCreary (the CPT interviewer) testified at the hearing (*id.* at 38–58). After taking

testimony and reviewing the hearsay statements at issue, the trial court made the

following findings as to the admissibility of E.B.'s hearsay statements:

> The Court does find the videotaped [CPT] interview to be admissible under 98.0323.  The child was 14 at the time that she was interviewed.  The incidents which she described took place over a period of a little over a year between the times she was 13 and 14.  The testimony was internally consistent during the interview.  She appeared to have no difficulty recollecting it.  She had not volunteered information, but when asked, she, as Defense observed, she was articulate and relevant and appropriate in answering the questions.  The recitation of factors that the State's attorney made in her argument, in the first part of her argument, not in the rebuttal, but I adopt those.[4]  I think that's supported by the facts and so I adopt those as part of the Court's order.

> The Court does note that when she [E.B.] was in the [CPT] interview at the Kids House that she had a very typical demeanor for a 14-year-old who was going into a room with a stranger to talk to her.

---

4  The prosecutor recited the following factors that the court should consider in determining the admissibility of the child victim's hearsay statements, which are factors listed in the relevant provision of the Florida Evidence Code:  (1) the mental and physical age and maturity of the child (the prosecutor argued E.B. was 14 years old at the time of the interview); (2) the nature and duration of the abuse (the prosecutor argued that at the time of the interview, the abuse had been going on for approximately one year, and the last sexual contact was a few days before the interview); (3) the time of the abuse relative to the time of the statement (the prosecutor argued that since the last sexual contact was a few days before the interview, it was "still fresh in the victim's mind"); (4) the relationship of the child to the offender (the prosecutor argued that Profete was E.B.'s maternal uncle; that she appeared to be close to him; and that he interacted well with the family); (5) whether or not the victim was still emotionally affected by the situation when she reported it (the prosecutor argued that E.B. broke down and was crying when she disclosed the abuse to her mother and during the CPT interview); (6) whether or not the victim used terminology appropriate for her age (the prosecutor argued that E.B. used words like "private" and "thing" instead of penis, and "white stuff" instead of ejaculate, which was appropriate for a teenager); (8) the victim's mental competence and ability to distinguish reality and fantasy (the prosecutor argued that E.B.'s statements were very clear, intelligible, specific, and consistent); (9) whether or not there was a possibility of improper influence (the prosecutor argued that Profete was close to E.B. and her mother, and he helped the family; and that there was no evidence that E.B. was motivated to lie or get Profete "in trouble").

She talked very appropriately, but then when it was turned to, you know, why you are here that is when she first begin to display emotion, but she then was able to pull herself together and answer very directly the questions that were asked and discussed.  She did use the terms as the State said that were—would seem to be appropriate to someone of her age as opposed to terms that were—might be picked up from the street lingo or raunchy movies or anything of that nature.  She described the product of his sex with her as white stuff.  She described his organ as his thing and although she did describe her vagina by name, that does not appear unusual for me for a 14-year-old to do that.  She made this videotaped interview or she gave this videotaped interview not as a volunteering thing on her part, but as the result of her mother confronting her and then the law enforcement officers coming and then her going and being taken down there and so it's not like she approached somebody with a made up story.  It appears that it increases reliability that when she had been confronted that she then begin [sic] to make the statement as she did.

The Court finds no motive to fabricate and I find that her mental competence seems, at the very least average, if not above average and I see nothing in any of the evidence that I have heard that would make me believe that the child has any difficulty distinguishing reality from fantasy or that she was improperly influenced by anyone.  There was just no reason for the—in the evidence before this Court, there appears no reason to believe that there was improper influence by the mother because the mother called law enforcement before she talked to the child and then—they are on their way and then she talks to the child and then the child says something but then really gives her story to the interviewer at the Kids House.  The mother and the Defendant are siblings.  The mother has treated the Defendant like a family member allowing him to stay in her house when he needed to, providing for him to the extent that he needed to, letting him take trips with the family at different times.  So there just does not appear from any evidence before the Court for there to be a reason to fabricate a pressure upon the child to do so or a motive to get the child to testify falsely with regard to this.

However, regarding the statement to the mother, the Court would not permit that to be presented on the case—the State's case-in-chief.

It was not spontaneous. It was under pressure from the mother to tell her what happened and the mother told her that the Defendant had already told her what had happened and advised that the law enforcement was on the way and for those reasons, the reliability suffers. I do not find though that there was any connection between what her mother asked her about and what the child said during the Kids House interview. The child in no way made reference to anything about the mother having put pressure upon her to make up a story or fabricate or that was she was threatened in anyway. There was absolutely no statements of the child that are anything in the interview related to the mom saying tell me what happened or, you know, that the brother had told her what had been going on and there was a separation of time, there was a separation of place so both physically and temporarily there was a separation between the first statements, hearsay statements, and the interview statements at the Kids House. So I just do not find that there was a taint or that the interview at the Kids House was impermissibly influenced by what the interview with the mother was at all. So I would conclude with saying simply this: This ruling on the statements made to the mother is subject to being reconsidered if for some reason it becomes relevant. If, for example, it's argued that well, you never told anybody—before this interview at the Kids House you never said anything to anybody at all or, you know, you never told your mother, anything that would make it clearly appropriate rebuttal evidence. But unless and until that happens then the interview with the—the statements made to the mother would not be admissible. Obviously it's my understanding that the child is going to testify and this ruling is based upon the expectation that the child's going to testify.

(App. A at 64–68). The First DCA affirmed the trial court's ruling.

There is no Supreme Court case holding that a trial court must use the Fourth Amendment's exclusionary rule analysis to determine the admissibility of a child victim's hearsay statements in a defendant's criminal trial when there has been no illegal action by a government official. The Supreme Court cases cited by Profete

in his brief to the First DCA and his amended § 2254 petition, i.e., *Silverthorne Lumber Co., Wong Sun,* and *Brown*, did not deal with circumstances remotely similar to the circumstances presented to the state court.  Those Supreme Court cases dealt with the admissibility and evidentiary use of a defendant's or co-defendant's statements, as well as other evidence, obtained after illegal conduct by government officials (for example, illegal entry into a home or an illegal arrest).

Considering the lack of a holding from the Supreme Court on the federal issue Profete raises in Ground One, the state courts' rejection of the claim was not contrary to or an unreasonable application of clearly established federal law.  *See Woods v. Donald*, 575 U.S. 312, 317–19 (2015) (where no Supreme Court case confronts the specific question presented by the habeas petitioner, the state court's decision could not be contrary to or an unreasonable application of any Supreme Court holding) (citation omitted)); *Wright v. Van Patten*, 552 U.S. 120, 125–26 (2008) (where no Supreme Court decision squarely addresses or gives a clear answer to the question presented by the habeas petitioner, let alone an answer in the petitioner's favor, it cannot be said that the state court unreasonably applied clearly established federal law) (citation omitted)) *Schriro v. Landrigan*, 550 U.S. 465, 478 (2007) (state court did not unreasonably apply federal law, because "[W]e have never addressed a situation like this."); *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (given the lack of

holdings from the Supreme Court regarding the issue presented by the petitioner, the denial of relief by the state court was not contrary to or an unreasonable application of clearly established federal law).

Profete has not satisfied § 2254(d); therefore, he is not entitled to federal habeas relief on Ground One.

**B.    Ground Two:  "The trial court erred in admitting the hearsay statements made by Bain in the text messages pursuant to the exception for admission by a party opponent, where the statements contained Bain's theories about the case and Profete responded in an unequivocal manner."**

Profete contends the trial court erred by permitting the State to introduce Vione Bain's (E.B.'s mother) text message conversations with Profete, during which Ms. Bain posed as E.B. unbeknownst to Profete (ECF No. 17 at 7; ECF No. 18 at 7–8).  Profete argues the text messages did not qualify as admissions under Fla. Stat. § 90.803(18)(a), nor were they "adoptive admissions" under § 90.803(18)(b) (ECF No. 18 at 7–8).   Profete also contends Bain's side of the conversations were inadmissible under § 90.403, because their probative value was outweighed by the danger of unfair prejudice due to their containing Ms. Bain's beliefs and theories about Profete's guilt (*id.*).

Profete argues,  "The State has decided clearly established Federal Law [sic], "Contrary to" or "involved an unreasonable application" as provided by law of the

Florida statutes for admission." (ECF No. 17 at 7; *see also* ECF No. 18 at 7–8). Profete states he presented this claim on direct appeal (ECF No. 17 at 7).

The State contends Ground Two does not present a cognizable federal claim, because Profete does not assert a federal constitutional challenge to admission of the evidence, and instead argues that the state court misapplied the Florida Evidence Code and Florida case law (ECF No. 29 at 26–29).  The State further argues that Profete did not present a federal constitutional challenge to admission of Ms. Bain's text messages to either the trial court or the First DCA, and instead presented a challenge based purely on state law (*id.* at 28–29).  Therefore, Ground Two should be denied (*id.* at 29).

To prevail on a petition for federal habeas corpus relief, a petitioner must establish that he has been deprived of a right guaranteed by the United States Constitution or laws or treaties of the United States.  28 U.S.C. §2254(a); *Estelle v. McGuire,* 502 U.S. 62, 67–68 (1991); *Wainwright v. Goode*, 464 U.S. 78, 83–84 (1983); *Engle v. Isaac*, 456 U.S. 107 (1981); *Carrizales v. Wainwright*, 699 F. 2d 1053 (11th Cir. 1983).

Profete's claim raises a purely state law issue and does not involve a federal question.  His claim is identical to Issue Two of his counseled initial brief on direct appeal, which was based entirely on state law (*see* Appx. E at 19–26).  The only

difference is that here, Profete inserts the statutory language of § 2254(d)(1) in the statement of his claim. However, he does not allege that the state court's evidentiary ruling "violat[ed] . . . the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Profete argues only that the trial court erred in its application of the Florida Evidence Code, specifically, Florida Statutes § 90.803(18), which governs the admissibility of admissions by a party opponent, and § 90.403, which excludes evidence if its probative value is substantially outweighed by the danger of unfair prejudice (*see* ECF No. 18 at 7–8). Because Profete's claim is wholly grounded in the state courts' interpretation of Florida law, Ground Two is not cognizable on federal habeas review. *See, e.g.*, *Holsey v. Thompson*, 462 F. App'x 915, 917 (11th Cir. 2012) (unpublished but cited as persuasive authority) (holding that habeas petitioner's claims raised issues of purely state law and were not cognizable under federal habeas review, where petitioner claimed that the state appellate court erred in concluding that the trial court's erroneous evidentiary ruling and jury instruction were harmless).

Furthermore, the record supports the State's argument that Profete did not fairly present a federal claim to the state courts. "To satisfy the exhaustion requirement, the petitioner must have fairly presented the substance of his federal claim to the state courts." *Picard*, 404 U.S. at 277–78. A petitioner "fairly" presents

the substance of his federal claim when he describes the claim "such that [the state courts] are permitted the 'opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.'" *Kelley v. Sec'y Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004) (quoting *Picard*, 404 U.S. at 277); *French v. Warden, Wilcox State Prison*, 790 F.3d 1259, 1270–71 (11th Cir. 2015) (reaffirming that a habeas petitioner must "present his claims to the state court 'such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation.'") (quoting *Kelley*, 377 F.3d at 1344–45). Courts apply "fair presentation" principles "with common sense and in light of the purpose underlying the exhaustion requirement—namely, giving the state courts 'a meaningful opportunity' to address the federal claim." *Lucas v. Sec'y, Dep't of Corr.*, 682 F.3d 1342, 1351 (11th Cir. 2012) (quoting *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005)).

"[A] petitioner with a claim that could arise under either state or federal law must clearly indicate to the state courts that he intends to bring a federal claim." *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 458 (11th Cir. 2015). A petitioner does so, for example, by "including in his claim before the state appellate court the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Lucas*, 682 F.3d at 1351

(quoting *Baldwin v. Reese*, 541 U.S. 27, 32 (2004)); *see also Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (concluding that petitioner's federal claims were "fairly presented" when he provided enough information about the claims (and citations to Supreme Court cases) to notify the state court that the challenges were being made on both state and federal grounds).

A petitioner does not satisfy the exhaustion requirement "merely by presenting the state court with 'all the facts necessary to support the claim,' or by making a 'somewhat similar state-law claim.'" *Lucas*, 682 F.3d at 1352 (quoting *Kelley*, 377 F.3d at 1343–44). Similarly, "a petitioner cannot 'scatter some makeshift needles in the haystack of the state court record. The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined. Oblique references which hint that a theory may be lurking in the woodwork will not turn the trick.'" *French*, 790 F.3d at 1271 (quoting *Kelley*, 377 F.3d at 1345).

A claim that was not exhausted in state court and which no longer can be litigated under state procedural rules is considered procedurally defaulted, *i.e.,* procedurally barred from federal review. *O'Sullivan*, 526 U.S. at 839–40, 848; *Chambers v. Thompson*, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (holding that federal habeas courts should enforce applicable state procedural bars even as to claims that were never presented to the state courts). A petitioner seeking to

overcome a procedural default must show cause and prejudice, or a fundamental miscarriage of justice.  *Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993).

Here, it is clear that Profete's counsel did not alert the state courts to a federal constitutional claim.  On the morning of Profete's trial, defense counsel filed a motion in limine seeking to exclude text messages between E.B.'s mother (posing as E.B.) and Profete (*see* App. B at 103–38, 235–36, 237–41, 328).  Defense counsel argued that the evidence was irrelevant and not properly authenticated, and its probative value was substantially outweighed by the danger of unfair prejudice (*see id.*).  Defense counsel did not assert any federal basis for his challenge to admission of the text messages (*see id.*).  The trial court ruled that the text messages were admissible under the admission exception of the Florida Evidence Code, Florida Statutes § 90.803(18).

In Profete's initial brief on direct appeal, Profete's counsel argued in Issue Two that the trial court erred in admitting the text messages under the admission exception of the Florida Evidence Code, § 90.803(18) (App. E at 22–26).  Counsel further argued that the trial court erred by excluding the text messages under Florida Statutes § 90.403, because the probative value of the evidence was outweighed by the risk of confusing the jury (*id.*).  Profete's appellate brief did not mention any provision of the United States Constitution, did not argue that the admission of the

text messages affected the fundamental fairness of the trial, and did not cite a single federal case.  Profete, therefore, did not fairly present the state court with a federal constitutional claim.  *See, e.g., French*, 790 F.3d at 1270–71 (holding that habeas petitioner did not fairly present his claims that the trial court's exclusion of evidence violated his rights under the Confrontation Clause of the Sixth Amendment, when his state court appellate brief presented the issue as a purely state-law claim); *McNair*, 416 F.3d at 1301 (holding that habeas petitioner did not fairly present his claim that his federal constitutional rights were violated when the jury improperly considered extraneous evidence during deliberations, when his state court appellate brief couched the claim in terms of state law).

Any present attempt by Profete to present a federal challenge to the state court's evidentiary ruling was not exhausted in state court and is now procedurally defaulted.  Profete did not respond to the State's exhaustion argument (as previously noted, he did not file a reply to the State's answer), and neither his § 2254 petition nor his supporting memorandum suggest a basis for reviewing Ground Two under any recognized exception to the procedural bar.  Profete is thus not entitled to federal habeas relief on Ground Two.

**C.    Ground Three: "Counsel rendered ineffective assistance by failing to adequately investigate and conduct any meaningful adversarial testing process against the State's case in violation of the**

**Defendant's state and federal constitutional amendment provisional rights [sic]."**

Profete asserts the state court misinterpreted and/or misapplied *Strickland v. Washington*, 466 U.S. 668 (1984), in rejecting this claim during the Rule 3.850 proceeding and in his post-conviction appeal (*see* ECF No. 17 at 8–9; ECF No. 18 at 9–10).

The State concedes Profete exhausted this claim in the state courts (ECF No. 29 at 30). The State contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of *Strickland* (*id.* at 31–34).

### 1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To obtain relief under *Strickland*, the petitioner must show (1) deficient performance by counsel, and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If the petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was "reasonable considering all the circumstances," and

reasonableness is measured "under prevailing professional norms." *Strickland*, 466 U.S. at 688. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting *Chandler*, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected— and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001)).

If the record is not complete regarding counsel's actions, "then the courts should presume that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." *Jones*, 436 F.3d at 1293 (citing *Chandler*, 218 F.3d at 1314–15 n.15). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no

relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." *Jones*, 436 F.3d at 1293 (citing *Strickland*, 466 U.S. at 690); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

As to the prejudice prong of the *Strickland* standard, the petitioner's burden of demonstrating prejudice is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, the petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And the petitioner must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder

would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncracies [sic] of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at 695.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. at 788. As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

### 2.   Federal Review of State Court Decision

Profete presented Ground Three as Ground One of his Rule 3.850 motion (App. M at 12–17).  Profete alleged he told defense counsel that his fiancée, De'Shea Streeter, stayed with him at his sister's house (where E.B. lived) for two weeks, and they engaged in sexual activity in the area of the home where Profete's semen was discovered (*id.* at 12–14).  Profete alleged DNA testing showed that E.B.'s DNA was not detected in the semen (*id.*).  Profete alleged Ms. Streeter was willing to submit to DNA testing, which would have resulted in a "higher probability" that her DNA was present in the semen (*id.* at 14).  Profete alleged defense counsel knew that State's witnesses would corroborate the fact that Ms. Streeter visited, but they asserted it lasted only one night, not two weeks (*id.* at 13).

Profete also argued defense counsel failed to investigate and use the report of Michelle Newgent, a child protection investigator who was the first investigator to speak to E.B. and Ms. Bain (E.B.'s mother) at the residence when Ms. Bain reported the sexual contact between E.B. and Profete (App. M at 14).  Profete acknowledged that defense counsel had a copy of the child protective services report (*see id.* at 23).  He attached a copy of the report to his Rule 3.850 motion (*id.* at 70–71, 84–87).  The relevant portion states the following:

> The mother reported to CPI Newgent that several weekends ago the she
> [sic] came down the stairs at about two am and found both the uncle

and the [victim] close to each [other] and when they saw her they sprang apart.  She asked the child if anything had happened and the child denied that it did.  The mother was still suspcious [sic] and after looking at her daughters [sic] phone she found numerous texts between the child and uncle.  Some had apparently been deleted and she went and got copies of the texts and asked her child again about the uncle.  She [the victim] admitted that they had been having sex and she [the mother] took her to the naval hospital to be checked out but she [the victim] refussed [sic] to be examined.  LE was notified ae well.

The [victim] was interviewed by CPI Newgent and she was seen by CPT and made disclosures of anal, vaginal and oral sex by the uncle.  The [victim] reported that her uncle started having sex with her about 1 1/2 [years] ago and that it happened when the mo[ther] was away for the military and the uncle was staying in the house helping the stepfather.  The ch[ild] did not give history of any of the other children witnessing the sexual acts.  The ch[ild] report [sic] her mother and stepfather never knew about what happened.  She did say she almost got caught.

The other children in the home are reported to have been around when the abuse was occuring [sic] but the verbal children made no disclosure seeing or being told about any sexual abuse in the home.  A non verbal [sic] child was observed to hump his sister and it is likely he witnessed some of the abuse but this was never confirmed.  The other verbal children in the home denied being victims of sexual abuse.

 (App. M at 71).

Profete contended that by failing to arrange for DNA testing of Ms. Streeter and failing to investigate or use CPI Newgent's report, defense counsel failed to develop a sound defense strategy (App. M at 15–17).  He argued the result of trial would have been different if defense counsel had taken these investigatory steps and used the evidence produced as a result (*id.*).

In the state circuit court's written decision denying the claim, the court cited *Strickland* as the legal standard applicable to claims of ineffective assistance of trial counsel (IATC) (App. M at 114–15).  The court adjudicated this particular IATC claim as follows:

> The Defendant claims his trial counsel failed to "adequately investigate and conduct any meaningful adversarial testing against the State's case."  The Defendant specifically claims that counsel should have further investigated the DNA sample recovered from the carpet to ascertain whether Ms. Streeter's DNA was also present.  This claim of ineffective assistance of counsel is without merit.

> Even if the DNA mixture contained Ms. Streeter's DNA, there is no reasonable probability the result of the Defendant's trial would have been different.  First, Ms. Streeter's DNA on the carpet could have simply been the result of the shedding of her skin cells and would not necessarily be present as the result of sexual activity with the Defendant.  <u>Attachment 2</u>, at 357–359.

> Second, the presence of Ms. Streeter's DNA would not change the fact that the victim knew where the Defendant's ejaculate could be located.  Indeed, the presence of Ms. Streeter's DNA would not significantly undermine the victim's trial testimony in any way.

> Finally, in light of the highly incriminating evidence of the Defendant's responses to text messages sent from the victim's phone, there is no reasonable probability . . . the jury would have reached a different result merely due to the presence of Ms. Streeter's DNA when it was uncontroverted that Ms. Streeter had visited the residence.

> The Defendant also claims that his counsel should have investigated a DCF report the Defendant has attached to his post-conviction motion.  Considering the report in light of all the evidence presented at trial, the Court finds that there is no reasonable probability the result of the Defendant's trial would have been different had counsel

> investigated this report.  This report would not significantly undermine
> the victim's testimony, the DNA evidence corroborating the victim's
> account, and the incriminating text messages between the Defendant
> and who he believed was the victim.

(App. M at 115–16).  The circuit court attached portions of the state court record to

its decision.  The First DCA affirmed the circuit court's decision without explanation

(App. O).

In *Wilson v. Sellers*, 138 S. Ct. 1188 (2018), the Supreme Court held that

where there has been one reasoned state judgment rejecting a federal claim followed

by a later unexplained order upholding that judgment or rejecting the same claim,

federal habeas courts employ a "look through" presumption.  The *Wilson* Court

described this presumption as follows:

> We hold that the federal court should "look through" the unexplained
> decision to the last related state-court decision that does provide a
> relevant rationale.  It should then presume that the unexplained decision
> adopted the same reasoning.

*Id.* at 1192.

Looking through the First DCA's unexplained decision, and considering the

trial evidence, the state court reasonably rejected Profete's IATC claim on the

prejudice prong.  As discussed *supra* in Ground One, the jury saw the videotaped

interview of E.B. by a member of the Child Protection Team.  During this interview,

E.B. stated the reason she was at the interview was because her uncle, Josalien

Profete, was having sex with her (App. B at 216–17).  E.B. stated they had sex at the house where she lived (*id.* at 217).  E.B. stated she was thirteen years old the first time it happened, and fourteen years old the last time (*id.* at 218, 226).  She stated she was in the bathroom brushing her teeth, and Profete "hurried" upstairs, bent her over the sink, pulled down her pants, "put [his] thing in me real [sic] quick," and then stopped when he heard other children coming upstairs (*id.* at 218, 220).  When asked what she meant by "thing," E.B. answered, "[h]is private part." (*id.* at 218).  When asked exactly where Profete put his private part, E.B. answered, "My vagina." (*id.* at 220).  E.B. shook her head when asked whether Profete put anything on his private part (*id.* at 218–19).  E.B. stated nothing came out of Profete's private part on that occasion (*id.* at 219–20).  She stated her menstrual period "started acting funny" after that, "like, sometimes go on for a little bit, and now they go on for a long time." (*id.* at 221).

E.B. told the CPT interviewer that the last time she and Profete had sex, they were downstairs in the living room (App. B at 221–22).  E.B. stated Profete pushed her on the couch and yanked her pants down (*id.* at 222).  E.B. stated Profete told her to be quiet, because her brother and sister were in the house (*id.*).  E.B. stated Profete "had me put his thing in my mouth." (*id.*).  She stated he then made her bend over to the side of the couch and had sex with her (*id.* at 223).  E.B. stated "white

stuff" came out of Profete's private part and went on the floor, but he wiped it with a napkin (*id.*).  E.B. stated Profete never put anything on his private part when he had sex with her (*id.*).

E.B. stated she and Profete had sex more than ten times, and "white stuff" came out of his private part every time (App. B at 225).  She stated they had sex in the bathroom, her brother's bedroom, her room, the hallway, the kitchen, the laundry room, the dining table, and "downstairs in both rooms" (*id.* at 228).  E.B. stated Profete would initiate sex by staring at her and then playing with his private part until it was hard (*id.* at 231–32).

E.B. stated that between the first and last time she and Profete had sex, he had put his private part in her mouth between ten and twenty times (App. B at 224–25).  E.B. stated that one of those times, Profete put the "white stuff" on her face and mouth (*id.* at 225).  E.B. stated Profete also asked her to rub his private part (*id.* at 230).  She stated Profete touched her chest, butt, and vagina with his hands (*id.*).

E.B. told the CPT interviewer that Profete showed her pornographic videos on his phone of adults having sex (App. B at 229).  She stated this happened less than five times (*id.*).

E.B. told the interviewer that her little brother and sister saw her and Profete having sex (App. B at 232–33).  She stated she told one of her brothers about the

sex, but he said she was lying (*id.* at 233). E.B. stated she never tried to tell an adult about what happened (*id.*).

E.B. testified in person at Profete's trial and provided additional details. She testified that Profete ejaculated on her back as well as on her face (App. B at 259–60). She testified that a couple of times, Profete had sex with her after she had showered after track practice (*id.* at 261). E.B. testified she was completely naked during those times, but during the other times, she was clothed (*id.*). E.B. testified that Profete was clothed when they had sex, except one time when he was naked on the family room couch (*id.* at 261–62). E.B. testified that in addition to her giving Profete oral sex, Profete put his mouth on her vagina (*id.* at 262–63, 267).

E.B. testified that Profete told her to say "yes" during sex (App. B at 270). She testified that after sex, he sometimes joked about it (*id.* at 271). E.B. testified that Profete sometimes asked her if she was okay with having sex, and after a while, she said yes (*id.*). E.B. testified that Profete talked to her while he was watching pornographic videos and suggested that they try the sexual positions depicted in the videos (*id.* at 271–72). E.B. testified Profete told her that he loved her, and he texted her "all the time" (*id.* at 272). She testified Profete texted her about having sex and about being together as boyfriend/girlfriend (*id.* at 272–73). E.B. testified Profete told her to delete his text messages, so she did (*id.* at 273). E.B. testified she

identified Profete as "Amigos" and "Loser" in the Contacts of her phone (*id.* at 273–75).  E.B. identified her cell phone number and Profete's number (*id.* at 272, 275).

E.B. testified that a few days after the first time Profete had sex with her, she told her brother "Tank" that Profete was a rapist, but Tank did not believe her (App. B at 255–56).  She testified that her siblings VJ (two years old) and Liyahm (one year old) saw her and Profete having sex on more than one occasion (*id.* at 276–77).  E.B. testified that at one point, she saw Liyahm "humping" her other sister (Miranda) (*id.* at 281).  She testified she texted Profete about what Liyahm did, and Profete responded, "We almost got caught." (*id.* at 281–82).

E.B. testified that the first time she told her mother about the sex was the day her mother told her that the police were coming to the house (App. B at 277–78).  E.B. testified that days before that, she and Profete had sex on the couch in the family room, and Profete ejaculated near the couch (App. B at 266–68).  E.B. located the area on a diagram (*id.* at 267).  She testified she showed the police where Profete ejaculated when the police came to her house (*id.* at 267–68).

The State presented testimony from Shelley Dill, a crime scene investigator (App. B at 312–16).  Investigator Dill testified she was one of the officers who went to E.B.'s house on June 19, 2014.  Investigator Dill testified she used a "black light" to view the areas of the family room identified by E.B. for evidence of DNA, and

saw evidence in front of the couch and at the base of the couch.  Investigator Dill testified she collected swabbings of the areas for DNA testing.

Leann Hodge, a crime lab analyst with the Florida Department of Law Enforce, testified she compared the swabbings from the carpet with a buccal swab collected from Profete and determined that the DNA was Profete's, unless he had an identical twin (App. A at 204–09; App. B at 348–60).

The State introduced E.B.'s and Profete's phone records, which showed many calls between E.B.'s phone and Profete's phone (App. A at 108–210; App. B at 307–11).  The State also introduced, through the testimony of E.B.'s mother, text messages exchanged between E.B.'s phone and Profete's phone, when E.B.'s mother was posing as E.B. (App. A at 86–94; App. B at 326–40).  E.B.'s mother testified that Profete's number was identified as "Amigos" in E.B.'s phone contacts (Appx. B at 327).  The text messages from "E.B." (actually, her mother) referenced sex between E.B. and Profete, expressed embarrassment and fear that E.B.'s mother knew they were having sex, and expressed guilt about losing her virginity, having sex with her uncle, lying to her mother, and exposing the younger siblings to sexual activity (App. A at 90–94; App. B at 327–37). In Profete's responsive texts, he did not deny sexual activity with E.B. (*see id.*).  Profete told "E.B." not to feel guilty, and that "I see what u [sic] sayin' [sic]" (App. A at 94; App. B at 337).  In Profete's

texts, he dismissed the mother's suspicion as a product of intoxication, and essentially laughed when "E.B." mentioned her one-year-old sister's simulating sex (App. A at 90–94; App. B at 327–37).

Profete testified in his own defense (*see* App. B at 371–408).  Profete testified he never had sexual contact with E.B. (*id.*).  He described the text messages as "inside jokes" (*id.*).

Considering the trial evidence, the state court reasonably concluded there was no reasonable probability the jury would have returned a different verdict on any count if defense counsel had investigated Ms. Streeter's DNA to determine if it was mixed with Profete's in the semen discovered on the carpet, or if counsel had somehow used CPI Newgent's report at trial.   Profete is not entitled to federal habeas relief on Ground Three.

    **D.**    **Ground Four:  "Counsel rendered ineffective assistance by failing to interview, secure, and/or present readily available defense witnesses, in violation of the Defendant's state and federal constitutional amendment provision [sic] rights."**

Profete asserts the state court misinterpreted and/or misapplied *Strickland v. Washington*, 466 U.S. 668 (1984) in rejecting this claim during the Rule 3.850 proceeding and in his post-conviction appeal (*see* ECF No. 17 at 9; ECF No. 18 at 9–10).

The State concedes Profete exhausted this claim in the state courts (ECF No. 29 at 34–35).  The State contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of *Strickland* (*id.* at 35–38).

### 1.    Clearly Established Federal Law

The *Strickland* standard governs this IATC claim.

### 2.    Federal Review of State Court Decision

Profete presented Ground Four as Ground Two of his Rule 3.850 motion (App. M at 17–22).  Profete alleged defense counsel was ineffective for failing to present testimony from his fiancée, De'Shea Streeter, and his mother, Livonia Profete (*id.* at 18–19).  Profete alleged Ms. Streeter would have testified she stayed with him at Ms. Bain's house for two weeks, during which time they attended a wedding party and a New Year's Eve party (*id.*).  Profete alleged his mother would have testified she stayed with him at Ms. Bain's house during the entire time the alleged offenses occurred (*id.* at 19).  Profete alleged the testimony of these two witnesses would have refuted the "fabricated testimony" presented at trial (*id.*).

Profete submitted a Statement of Witness signed by his mother, Livonia Profete, on December 26, 2016 (App. M at 72).  Ms. Profete states, in relevant part:

> My name is Livonia Prophete [sic] formally known as (Livonia Robinson) Age 71.  I am the Defendant Josalien Profete's mother.  I

also am a witness in the alleged accusations leading to Mr. Profete's conviction.  I was present at the residence at all said times and dates of all said proposed actions.  I fully testify that none of the actions that the defendant is being accused of by the accuser whom is my Granddaughter, happened in the residence, because I was present and residing in the home.

I was available and ready to present my statement in court, and I provided this statement to the Defendant's Assigned public defender appointed by the [S]tate of Florida, Mr. Bradley Rowe.  Mr. Rowe never asked me to present or testify, my statement [sic] in court.

(App. M at 72).

The state circuit court adjudicated this particular IATC claim as follows:

The Defendant asserts that his counsel was ineffective for failing to call defense witnesses.  Specifically, the Defendant claims that his counsel should have called Ms. Streeter and his mother Livonia Profete as witnesses at trial.  This claim of ineffective assistance of counsel is without merit.

Initially, the Court would note that the Defendant's mother could reasonably be perceived by a reasonable defense counsel as being seen by the jury as a biased witness.  See Ball v. United States, 271 Fed. Appx. 880, 884 (11th Cir. 2008) ("Ball's alibi witnesses were all close family members with a strong motive to fabricate an alibi defense for him.  As such, their testimony would not have been particularly compelling and would have been subjected to vigorous impeachment.").  Similarly, Ms. Streeter was planning to marry the Defendant as she testified at sentencing.  See Motion, at page 24.

More importantly, the victim testified that only her very young, nonverbal siblings witnessed any sexual activity between herself and the Defendant.  Thus, any testimony from these two witnesses that they never witnessed sexual activity between the Defendant and the victim would not be inconsistent with the victim's account  Indeed, even according to the Defendant's account, Ms. Streeter lived in Mobile,

Alabama, and was only an occasional visitor to the victim's residence in Florida.  Attachment 2, at 380–381.

> Neither witness could testify as to the Defendant's reputation for sexual morality or normalcy.  Hendricks v. State, 34 So. 3d 819, 825–26 (Fla. 1st DCA 2010).  Neither Ms. Profete nor Ms. Streeter could testify as to their opinion as to the Defendant's guilt.  Martinez v. State, 761 So. 2d I 074 (Fla. 2000).  Neither witness could offer testimony as to their opinion as to the truthfulness of the victim's testimony.  Seibert v. State, 923 So. 2d 460,472 (Fla. 2006).  Under these circumstances, it is plain from the record that Defendant's counsel was not ineffective for failing to call these two witnesses.

(App. M at 116–17).  The First DCA affirmed the circuit court's decision without explanation (App. O).

The state court's reasons for denying Profete's claim were sound.  E.B. testified that the sexual abuse occurred over the course of approximately one year, and no one was present when it occurred except her young siblings.  Even if Profete's mother would have testified she was in the home during that time period and did not see any sexual contact between Profete and E.B., this testimony would not have refuted E.B.'s testimony.  Similarly, Ms. Streeter's proposed testimony of her observations during a two-week period would not have refuted or discredited E.B.'s testimony.  Considering the minimal exculpatory value of the witnesses' proposed testimony and their bias towards Profete (as mother and future wife), defense counsel's failure to investigate or present their testimony was not deficient.  Further, the jury heard, through Profete's testimony, that his mother stayed at E.B.'s home

from December of 2013 to May of 2014 (*see* App. M at 202–03)).  Profete also

testified that Ms. Streeter visited the home, and they had sex during her visit (*id.* at

209–11).  There is no reasonable probability the jury would have returned a different

verdict on any count if defense counsel had presented testimony from Profete's or

Ms. Streeter or both.

Profete has not demonstrated that the state court unreasonably applied

Strickland in denying this IATC claim.  Therefore, he is not entitled to relief on

Ground Four.

>    **E.    Ground Five:  "Counsel rendered ineffective assistance by failing
>    to preserve readily available evidence that substantiated the
>    suppression of the State-tainted evidence, and/or its witnesses [sic]
>    pretrial statements in violation of the Defendant [sic] state and
>    federal constitutional amendment provisional [sic] rights."**

Profete asserts the state court misinterpreted and/or misapplied *Strickland v.*

*Washington*, 466 U.S. 668 (1984) in rejecting this claim during the Rule 3.850

proceeding and in his post-conviction appeal (*see* ECF No. 17 at 11; ECF No. 18 at

9–10).

The State concedes Profete exhausted this claim in the state courts (ECF No.

29 at 39).  The State contends the state court's adjudication of the claim was not

based upon an unreasonable determination of the facts, nor was it contrary to or an

unreasonable application of *Strickland* (*id.* at 40–44).

### 1.    Clearly Established Federal Law

The *Strickland* standard governs this IATC claim.

### 2.    Federal Review of State Court Decision

Profete presented Ground Five as Ground Three of his Rule 3.850 motion (App. M at 22–29).  Profete alleged defense counsel was ineffective for failing to make additional arguments to the trial court in opposition to the State's seeking to admit the videotaped interview between E.B. and the CPT interviewer.  Profete alleged defense counsel failed to inform the court that prior to the CPT interview, E.B. had been interviewed by not only her mother and law enforcement, but also by CPI Newgent.  Profete alleged if defense counsel had informed the trial court of the additional interview by Newgent, the court would not have determined that the "taint" of the mother's questioning had dissipated by the time of the CPT interview, which would have precluded admission of the videotaped CPT interview.

Profete also alleged the State violated *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to provide the defense with CPI Newgent's report during discovery (App. M at 26–27).  Profete alleged the report contained the victim's statement that she and Profete engaged in not only oral and vaginal sex, but also anal sex (*id*.).  Profete alleged the victim did not disclose anal sex during the CPT interview or her trial

testimony, and defense counsel could have, and should have, impeached the victim's testimony with this prior inconsistent statement (*id.* at 27–29).

The state circuit court adjudicated this claim as follows:

> In his third claim, the Defendant contends that his counsel was ineffective for failing to present "evidence that substantiated the suppression[FN 1] of the State's tainted evidence." This claim is without merit.
>
>> [FN 1: To be clear, there was not a "suppression" hearing in this case. Rather, a hearing to determine the admissibility of child hearsay evidence was conducted. § 90.803(23), Fla. Stat. The Court found that the victim's statements to her mother were inadmissible, but the victim's interview at the Gulf Coast Kids House was admissible. Attachment 7.]
>
> Even if the child hearsay evidence of the victim's statements at the Gulf Coast Kids House had not been admitted into evidence, the Defendant's statements in the text messages he sent, the DNA evidence collected from the victim's residence, and the victim's in court testimony would all have been admitted into evidence at trial. Attachment 2. There is no reasonable probability the result of the Defendant's trial would have been different had the admitted child hearsay evidence in this case had [sic] been excluded.
>
> The Defendant also contends that a report from the Department of Children and Families indicates that victim reported anal sex, but the victim did not testify as to anal sex at trial. The Defendant contends that this report constitutes Brady evidence. Prior inconsistent statements of the victim can constitute Brady evidence. In this case, the Court concludes that this report is not material within the meaning of Brady. The victim testified consistently at the Gulf Coast Kids House and at trial that the sex between the Defendant and herself consisted of oral sex and penile-vaginal sex. Even if a prior inconsistent statement of the victim had been admitted, the victim's prior consistent

statements would have been admissible to rehabilitate the victim's
testimony.  Monday v. State, 792 So. 2d 1278 (Fla. 1st DCA 2001).
More importantly, any prior inconsistent statement would not alter the
key facts that the victim knew where the Defendant's ejaculate could
be located and the highly incriminating evidence of text messages
between the Defendant and who he believed was the victim.  There is
no reasonable probability this evidence of a prior inconsistent statement
would have caused the trial to arrive at a different result. "[T]he
materiality prong of Brady has been equated with the *Strickland*
prejudice prong." *Rivera v. State*, 995 So. 2d 191,205 (Fla. 2008).

(App. M at 117–18).  The First DCA affirmed the circuit court's decision without
explanation (App. O).

The state court reasonably rejected Profete's IATC claim on the prejudice
prong.  E.B.'s trial testimony was substantially the same as her statements during the
CPT interview, but with more detail.  Considering the other evidence adduced at
trial, including E.B.'s in-person testimony, Profete's semen recovered exactly where
E.B. told police it would be, and the text messages, there is no reasonable probability
the jury would have returned a different verdict on any charge even if the CPT
interview had not been admitted.

With respect to Profete's *Brady* claim concerning CPI Newgent's report and
Profete's IATC claim relating to defense counsel's failure to use the report at trial,
both claims are without merit.  Profete's *Brady* claim fails because he admits the
defense was provided the DCF report which included the notes of CPI Newgent's
interview with E.B. (*see* App. M at 23, 26).  Further, Profete did not demonstrate

"materiality" for *Brady* purposes, or prejudice under *Strickland*, because there is no reasonable probability the outcome of trial would have been different if defense counsel had attempted to impeach E.B. trial testimony with her statement to CPI Newgent that she and Profete had anal sex (in addition to oral and vaginal).[5]

Profete has not demonstrated that the state court's adjudication of Ground Five was contrary to or an unreasonable application of clearly established federal law.  Therefore, he is not entitled to federal habeas relief on this claim.

**F.    Ground Six:  "Counsel rendered ineffective assistance by failing to conduct an adequate cross-examination and achieve proper impeachment in violation of the Defendants [sic] state and federal constitutional amendment provisional [sic] rights."**

Profete asserts the state court misinterpreted and/or misapplied *Strickland v. Washington*, 466 U.S. 668 (1984) in rejecting this claim during the Rule 3.850 proceeding and in his post-conviction appeal (*see* ECF No. 17 at 12; ECF No. 18 at 9–10).

The State concedes Profete exhausted this claim in the state courts (ECF No. 29 at 45).  The State contends the state court's adjudication of the claim was not

---

[5] As the state court noted, the prejudice standard of *Strickland* has been adopted as the materiality standard of *Brady*.  *See United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.) (adopting the prejudice standard of *Strickland* for claims under *Brady*); 473 U.S. 685 (White, J., concurring in part and concurring in judgment) (same).

based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of *Strickland* (*id.* at 45–48).

### 1.    Clearly Established Federal Law

The *Strickland* standard governs this IATC claim.

### 2.    Federal Review of State Court Decision

Profete presented Ground Six as Ground Four of his Rule 3.850 motion (App. M at 30–35, 37).  Profete alleged defense counsel was ineffective for failing to impeach the testimony of Vione Bain (E.B.'s mother) regarding Profete's relationship with Ms. Streeter.  Profete alleged Ms. Bain testified that Ms. Streeter visited her home in December, but stayed only one night for a wedding/New Year's Eve party.  Profete alleged Ms. Bain also testified that Profete considered Ms. Streeter to be just a friend and did not want her at the house.  Profete alleged defense counsel should have cross-examined Ms. Bain about the duration and nature of Streeter's visit and the duration and nature of Profete and Streeter's relationship. Profete alleges defense counsel was supplied with the following information:  (1) he (Profete) and Ms. Streeter were not just friends, but had been together for over two years and were engaged to be married; (2) the wedding party that occurred in December was for Profete and Streeter; and (3) Ms. Streeter's December visit lasted two weeks, not one night.  Profete alleged  defense counsel should have elicited this

information from Ms. Bain on cross-examination, and if counsel had done so, he would have impeached Ms. Bain's credibility.

The state circuit court adjudicated this particular IATC claim as follows:

> The Defendant argues that his counsel was ineffective in how counsel cross-examined a state witness. "[T]be manner in which counsel cross-examines a particular witness is a strategic choice and therefore 'virtually unchallengeable.'" Kessler v. Cline. 335 Fed. Appx. 768, 770 (10th Cir. 2009) (quoting Strickland, 466 U.S. at 690). More to the point, the Defendant did not suffer Strickland prejudice as a result of his counsel's cross examination of the victim's mother regarding the length of Ms. Streeter's stay the [sic] home or the strength of the Defendant's relationship with Ms. Streeter. Whether Ms. Streeter stayed at the residence for two weeks or a single night,[FN 2] and the health of the Defendant's romantic relationship with Ms. Streeter, are essentially immaterial issues. The Defendant was not denied a fair trial due to counsel's cross-examination of the victim's mother on these tangential points.
>
> [FN 2: The time period at issue was from May 1, 2013 until June 3, 2014. Attachment 1.]

(App. M at 118). The First DCA affirmed the circuit court's decision without explanation (App. O).

The state court reasonably rejected Profete's claim. In Profete's Rule 3.850 motion, he admitted that defense counsel **did** cross-examine Ms. Bain about the duration of Ms. Streeter's visit in December of 2013. The prosecutor elicited testimony from Ms. Bain about whether Profete had a girlfriend:

> Q. Did he ever have a girlfriend over that you know of, or a girl?

A.  He had his girlfriend over for a wedding party in December. December 2013 we had a wedding party.

Q.  And do you know, did she—how did they seem to get along?

A.  They were arguing over his phone.  She went through his phone and they were arguing.

Q.  Did—did she spend the night there?

A.  Yes, she spent the night there.  One night there.

(Appx. B at 171).

As the state post-conviction record demonstrates, on cross-examination, defense counsel asked Ms. Bain about the duration of Ms. Streeter's visit in December of 2013:

Q [by defense counsel].  Okay.  Now, was it also December when his girlfriend, Ms. Streeter, came to visit, too?

A [by Ms. Bain].  Yes.

**Q.  And he was—she was actually there for about two weeks; right?**

A.  No, she wasn't.  We had the party—we had the party on the 31st, so it was, like, basically the wedding party/New Year's Eve Party. Left the next day, left New Year's Day, arguing, crying over his phone, and—

Q.  Well, I didn't ask you about all that.

A.  She didn't—she stayed there that one night and I took her home the next day.

(App. M at 30–31 (emphasis added)).

Further, the state post-conviction record demonstrates that defense counsel elicited testimony from Profete himself about his relationship with Ms. Streeter and her visit in December of 2013, to explain the presence of Profete's semen on the carpet near where he slept (App. M at 209–11).  Profete testified that Ms. Streeter was his girlfriend (*id.*).  Profete testified Ms. Streeter visited for two weeks in December of 2013 for "her wedding party and New Year's bash" (*id.* at 380).  Profete testified he and Ms. Streeter slept together and had sex during her visit (*id.* at 380–81).  Profete repeated this testimony during the prosecutor's cross-examination (*id.* at 401).

The prosecutor then re-called Ms. Bain (App. B at 410–11).  Ms. Bain reiterated that Ms. Streeter stayed only one night in December of 2013.  The prosecutor asked Ms. Bain if Ms. Streeter was ever there for a two-week period, and Ms. Bain responded as follows:

> No, she was never—she was never at my house two weeks.  If she was there I don't know about that.  She was only there for that party.  The next day, she got sent—I went ahead and took her home.  He didn't want her there.  He was, like, that's not his girlfriend, that's his friend, and he didn't want her there.  I invited her because she's always at my mom's house, so we were having a party; the more the merrier.  That's how I looked at it.

(App. B at 411).  Defense counsel did not cross-examine Ms. Bain further (*see id.*).

The state court reasonably concluded that the duration and nature of Ms. Streeter's December visit and the duration and nature of Profete and Streeter's relationship were largely immaterial. Further, defense counsel conducted some cross-examination of Ms. Bain of these issues, and then presented evidence (Profete's testimony) refuting her testimony. There is no reasonable probability the jury would have returned a different verdict on any count if defense counsel had attempted further impeachment on these issues. Profete has not demonstrated he is entitled to federal habeas relief on Ground Six.

### G.    Ground Seven: "Counsel rendered ineffective assistance by failing to adequately move the court for a judgment of acquittal in violation of the Defendants [sic] state and federal constitutional amendment provisional [sic] rights."

Profete asserts the state court misinterpreted and/or misapplied *Strickland v. Washington*, 466 U.S. 668 (1984) in rejecting this claim during the Rule 3.850 proceeding and in his post-conviction appeal (*see* ECF No. 17 at 13; ECF No. 18 at 9–10).

The State concedes Profete exhausted this claim in the state courts (ECF No. 29 at 48–49). The State contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of *Strickland* (*id.* at 49–50).

### 1.    Clearly Established Federal Law

The *Strickland* standard governs this IATC claim.

### 2.    Federal Review of State Court Decision

Profete presented Ground Seven as Ground Five of his Rule 3.850 motion (App. M at 36–40).  Profete alleged there was no evidence presented at trial to support Count 3, which charged him with causing union of his mouth with E.B.'s vagina.  Profete alleged defense counsel made a motion for judgment of acquittal (JOA) but did not argue the lack of evidence to support Count 3.  Profete argued that the outcome of trial would have been different if defense counsel had made this argument in his motion for JOA.

The state circuit court adjudicated this particular IATC claim as follows:

> The Defendant claims that his counsel was ineffective for failing to "adequately" move for a judgment of acquittal.  See Attachment 2, at 362–364.  This claim is without merit.  The testimony of the victim alone constitutes legally sufficient evidence such that a judgment of acquittal would have been unwarranted.  Attachment 2, at 245–297.  "The testimony of a single witness, even if uncorroborated and contradicted by other State witnesses, is sufficient to sustain a conviction."  L.R. v. State, 385 So. 2d 686,688 (Fla. 3d DCA 1980).  Specifically, Defendant claims his counsel should have moved for a judgment of acquittal as to Count 3.  Such a motion would have been unavailing because the victim specifically testified that the Defendant performed oral sex on her.  Attachment 2, at 262, lines 16–21.

(App. M at 119).  The First DCA affirmed the circuit court's decision without explanation (App. O).

The state court's factual finding as to E.B.'s testimony on this issue is supported by the record. The portions of the trial transcript attached to the circuit court's decision confirm that E.B. testified Profete put his mouth on her vagina (App. M at 147). The circuit court determined that this evidence was sufficient, under Florida law, to withstand a motion for JOA.

Profete's claim that the state court unreasonably applied *Strickland* obviously depends upon this court's determining whether defense counsel's failure to include the argument in his motion for JOA was deficient, and whether counsel's including it would have resulted in the trial court's granting the motion as to Count 3. To so hold, this court first would have to conclude that the state court misinterpreted state law on the issue of whether the trial court would have granted the motion for JOA as to Count 3. This federal court may not draw this conclusion, because it must defer to the state's construction of its own law. *See Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984) (explaining that "[o]n the one hand, the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension," but, "[o]n the other hand, the validity of the claim [counsel] failed to assert is clearly a question of state law, and we must defer to the state's construction of its own law.") (citations omitted)[6]; *see also*

---

[6] *Alvord* was superseded by statute on other grounds as noted in *Hargrove v. Solomon*, 227 F. App'x 806 (11th Cir. 2007).

*Callahan v. Campbell,* 427 F.3d 897, 932 (11th Cir. 2005) (holding that defense counsel cannot be deemed ineffective for failing to make a state-law-based objection when the state court has already concluded that the objection would have been overruled under state law; to conclude otherwise would require the federal habeas court to make a determination that the state court misinterpreted state law, which would violate the fundamental principle that federal habeas courts should not second-guess state courts on matters of state law); *Herring v. Sec'y Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005) (denying federal habeas relief on ineffective assistance claim based on counsel's failure to make state law-based objection; holding that the Florida Supreme Court's conclusion that the proposed objection would have been overruled was binding and precluded federal habeas relief on the ineffective assistance claim: "The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should have done . . . . It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'") (alterations in original) (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997)).

Here, the state court has already determined that defense counsel did not have a meritorious basis for arguing that Profete was entitled to a JOA on Count 3. This

court must defer to the state court's determination of state law. The failure by defense counsel to include this argument in his motion for JOA cannot be deemed deficient performance, and Profete cannot show he was prejudiced by counsel's failure to include it, because it had no arguable basis for success. Profete is not entitled to relief on Ground Seven.

> **H.    Ground Eight: "Counsel rendered ineffective assistance by failing to object to the State's bolstering of its witnesses' testimony; inflaming the minds and passions of the jurors; and requests for the jurors' sympathy in violation of the Defendants [sic] state and federal constitutional amendment provisional [sic] rights."**

Profete asserts the state court misinterpreted and/or misapplied *Strickland v. Washington*, 466 U.S. 668 (1984) in rejecting this claim during the Rule 3.850 proceeding and in his post-conviction appeal (*see* ECF No. 17 at 14; ECF No. 18 at 9–10).

The State concedes Profete exhausted this claim in the state courts (ECF No. 29 at 52). The State contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of *Strickland* (*id.* at 53–60).

### 1.    Clearly Established Federal Law

The *Strickland* standard governs this IATC claim.

### 2.    Federal Review of State Court Decision

Profete presented Ground Eight as Ground Six of his Rule 3.850 motion (App.

M at 41–49).   Profete alleged during the State's rebuttal closing argument, the

prosecutor made several comments which improperly bolstered E.B.'s testimony,

sought sympathy for E.B., and speculated on E.B.'s "state of mind" (*see id.* at 41–

45).  Profete identified the following comments, indicated in **bold**, as improper:

> Now, Mr. Rowe [defense counsel] made kind of a big deal about
> [E.B.] and all of this coming to light.  And if you remember, the first
> person that she told—maybe she picked the wrong person—she told her
> little brother, who is 11 years old at the time.  And she said, I told him
> Josalien's a rapist, he didn't believe me, **and she said that he hurt me,**
> and I didn't tell anybody else after that.  She said she also didn't tell
> anybody—she didn't tell anybody until her mom said the cops are
> coming, and that's where she finally broke down and told her mom.
>
> **She said she didn't want to tell.  She had feelings for the
> defendant, she wanted to protect him.**  She didn't want to get him in
> trouble.  When she first told she said she felt bad because she got him
> in trouble.  This is someone that said she felt like [sic], she testified,
> **We had a relationship,** we texted like boyfriend/girlfriend, he told me
> he loved me, **we were going to be together when I got older**.  This is
> to a, remember, 13-years-old, you know, middle school child, the
> position she finds herself in, and then her uncle's telling her that he
> loves her and she wants to protect him.
>
> So remember that when you're thinking, Why didn't she say
> something.  Also remember that she's one of five kids.  Her mom's
> getting ready for deployment, and **maybe she doesn't mind a little
> extra attention from somebody.  She feels special.**  You know,
> maybe—maybe that was part of it, too.  But, again, she's a child, 13,
> 14-year-old, so try and understand how they react to this.  This is very

difficult for grownups and people who—who know resources to call and reach out, and you won't get in trouble if you tell.

**Again, we talked in jury selection on Monday, talked about responses. The same-trauma—Twin Towers, Boston Marathon Bombing—same trauma, different responses; we talked about that. This was her trauma, and this was her response to it.** Again, I ask you, Don't think about what you have seen on TV, how kids maybe tell right away, yell out right away. This is how [E.B.] responded to her trauma in her life.

And she said in her CPT interview, in her forensic interview, I wanted to ignore it. And Mr. Rowe said she gave robotic answers. Well, she—I mean, she also cried. I mean, so, it wasn't just—even if she didn't cry, I mean, this is her way of talking to a stranger. You heard Aayana McCreary, I met her in the lobby, we walked back in this room, then I'm asking how she had sex with her uncle. You have to put it in the context of, **This is not something she's comfortable with, not something she wants to talk about, but she did, and she did for you today.**

And remember, again, like we discussed on Monday, the law exists to protect children. **Whether at some point she felt like she was in love with him, and she just gave into it, that doesn't matter. That does not matter.** It does not make his behavior, his actions, legal. He is the adult. He is more than twice her age. He is her uncle, someone she is supposed to be able to trust.

. . . .

**Again, think about the uncomfortable and emotional and stressful seven to eight months that she's had since this all came to light.** And again, he [defense counsel] wants you to ignore all the other evidence, all the testimony, the physical evidence. Ignore that. And they want you to speculate that she's lying, that she has made this up.

(App. M at 42, 44, 254–56, 259).

The second group of comments that Profete alleged were objectionable were the prosecutor's comments about him (*see* App. M at 43–44). Profete alleges the prosecutor misrepresented his testimony and demeanor and attacked his character (*id.*). Profete identified the following comments, indicated in **bold**, as improper:

> **Again, what's important about those text messages is, he never—just like Ms. Bain said—he never said, What the heck are you talking about, why are we talking about sex, why am I talking about sex with my niece here. No, it was a big joke. Funny. Because he thinks it's funny getting away with having sex with his niece in his sister's house. Also, look for what's not there. Him saying, I don't want to talk about this with you, this is inappropriate.**
>
> . . . .
>
> Another important thing for you to remember is that the defendant decided to take the stand today. And his demeanor on that stand is a piece of evidence that you can consider when you are weighing the evidence. **He is charged with a heinous—well, a bunch of heinous crimes here, and he gets up on that stand, and he's smirking and laughing, and this is funny and an inside joke. And, you know, it's not a big deal, this is funny to him. And this is funny to him because he doesn't think that you're going to believe her.**
>
> **Because who's going to believe this little kid? So this is why it's so lighthearted and not a big deal to him, and that's something for you to consider.** He wants you to think—he wants you to think that [E.B.] is lying. [E.B.], who is his niece, who got along with him, who liked him, she decided one day to make this up and stick with it. Since June 4th—or June 3rd of 2014 until April 23rd of 2015 when she's—Mr. Rowe talked about all the people she talked to, and all the same things that happened, but she's making it up. He wants you to believe she's just making this up.

(App. M at 43–44, 256–59).

Lastly, Profete alleged the prosecutor improperly commented on the parties' discussions about lesser included offenses (*see* App. M at 43–44). Profete identified the following comments, indicated in **bold**, as improper:

> Now, Mr. Rowe talked about lesser includeds. And you'll get this packet, and it will have lesser includeds for certain offenses. **Some of the lesser includeds are committing an unnatural or lascivious act. And let me tell why you [sic] it's our position this is not an appropriate verdict to give.**
>
> Again, the verdict is your job, and you do what you see best, but on this "committing an unnatural and lascivious act," it says: Josalien Profete touched in, a lewd or lascivious manner, the breast, genitals, or genital area, the breast, buttocks, or clothing covering them. And it says, With [E.B.] "With her". That's not a typo, because it looks awkwardly worded. He does this with her. Again, she cannot consent to doing this.
>
> And again, if you think back to the first time in the bathroom, when he bends her over the sink, she did not—she said, He just came up and did that. As shocking as you might think that is, and you think that's weird, **she did not consent to that, cannot consent to that. That is an inappropriate choice to make. And then another lesser included offense is battery. To prove that crime, the State must prove that Josalien Profete intentionally touched or struck her against her will.**
>
> Again, this is not just touch. This is his penis in her vagina; him touching her boobs; him grabbing her butt. This is not—this is so much more than a simple battery. **So it's the State's position that, while they're there, and they're options for you, those are not appropriate findings for those charges.**

(App. M at 43–44, 257–58).

The state circuit court adjudicated Profete's IATC claim as follows:

The Defendant posits that his counsel was ineffective for failing to object to the State's closing argument. A prosecutor has wide latitude during closing argument, but the latitude has its limits. Reid v. State, 222 So. 3d 575 (Fla. 4th DCA 2017). Therefore, a "claim that counsel was ineffective for failing to object to remarks in a prosecutor's closing argument is cognizable in a motion for postconviction relief." Gonzalez v. State, 851 So. 2d 859, 860 (Fla. 2d DCA 2003).

The Court has reviewed the closing argument. Attachment 2, at 416–429, 436–443. Defense counsel was not constitutionally deficient for failing to object to the State's closing argument.

> [N]one of the remarks were so improper and prejudicial as to have required declaring a mistrial. In such instances, an attorney may decide that it is better not to object to the remark and ask for a curative instruction, because to do so would only further call the jury's attention to the improper remarks. Whether to object is a matter of trial tactics which are left to the discretion of the attorney so long as his performance is within the range of what is expected of reasonably competent counsel.

Muhammad v. State, 426 So. 2d 533, 538 (Fla. 1982).

Because the Defendant took the witness stand to testify on his own behalf, he subjected himself to opposing counsel's comments regarding his credibility and demeanor as a witness. Parker v. State, 641 So. 2d 483 (Fla. 5th DCA 1994). Moreover, it was not improper for the prosecutor to present argument as to why the victim did not come forward immediately. Such a comment was supported by the evidence. Attachment 2, at 272, 278. It was not objectionable for the prosecutor to present argument regarding the victim's lack of motivation to lie, as jurors are instructed to consider whether a witness has some interest in how the case should be decided. Attachment 6.

In summary, the Defendant was not denied a fair trial as a result of the prosecutor's closing argument in this case. Accordingly, the

Defendant cannot demonstrate <u>Strickland</u> prejudice as a result of his counsel not objecting to the arguments of the prosecutor.

(App. M at 119–20).  The First DCA affirmed the circuit court's decision without explanation (App. O).

Under Florida law, the standard for reviewing prosecutorial comments is the following:

> Wide latitude is permitted in arguing to a jury.  Logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments. . . .  A new trial should be granted when it is "reasonably evident that the remarks might have influenced the jury to reach a more severe verdict of guilt than it would have otherwise done."  Each case must be considered on its own merits, however, and within the circumstances surrounding the complained-of remarks.

*Breedlove v. State*, 413 So. 2d 1, 8 (Fla. 1982) (quoting *Darden v. State*, 329 So. 2d 287, 289 (Fla. 1976)) (other citations omitted).  This state rule is essentially the same as the federal due process standard governing allegedly improper argument by the prosecution.

A prosecutor may argue both facts in evidence and reasonable inferences from those facts.  *See Tucker v. Kemp*, 762 F.2d 1496, 1506 (11th Cir. 1985) (citations omitted).  But if the evidence is too insubstantial to support a reasonable inference, the prosecutor's comment will be deemed improper.  *Id.* at 1507.  Prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury may reasonably draw from it and the

impermissible practice of arguing suggestions beyond the evidence. *See United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992) (citation omitted).

Further, the prosecutor is not limited to a bare recitation of the facts; the prosecutor may comment on the evidence and express the conclusions he or she contends the jury should draw from the evidence. *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984). A prosecutor may comment on the uncontradicted or uncontroverted nature of the evidence and may point out that there is an absence of evidence on a certain issue during closing argument to the jury. *See White v. State*, 377 So. 2d 1149 (Fla. 1980).

The prosecutor may not, however, "'inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law.'" *Jones v. State*, 612 So. 2d 1370, 1374 (Fla. 1993) (quoting *Bertolotti v. State*, 476 So. 2d 130 (Fla.1985)).

Attempts to bolster a witness by vouching for his or her credibility are improper "if the jury could reasonably believe that the prosecutor indicated a personal belief in the witness' credibility." *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991) (citation omitted). A jury could believe that the prosecutor personally believed in the witness' credibility "if the prosecutor either places the

prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity, or the prosecutor implicitly vouches for the witness' veracity by indicating that information not presented to the jury supports the testimony." *Id.* (citation omitted). Thus, the court must examine whether (1) the prosecutor explicitly personally assured the witness' credibility, or (2) the prosecutor implicitly vouched for the witness' credibility by implying that evidence not presented to the jury supports the witness' testimony. *United States v. Castro*, 89 F.3d 1443, 1457 (11th Cir. 1996) (citation omitted).

It must be noted, however, that "[t]he prohibition against vouching does not forbid prosecutors from arguing credibility . . . it forbids arguing credibility based on the reputation of the government office or on evidence not before the jury." *United States v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir. 1991). Furthermore, when the prosecutor voices a personal opinion but indicates that this belief is based on evidence in the record, the comment is not improper. *United States v. Granville*, 716 F.2d 819, 822 (11th Cir. 1983) (finding no prosecutorial misconduct where prosecutor, in effort to support testimony of two government witnesses, only pointed to matters in evidence: the demeanor of one witness and testimony of support witnesses, as well as a tape recording corroborating the testimony of another)

(citations omitted); *Jackson v. State*, 89 So. 3d 1011, 1018–19 (Fla. 4th DCA 2012) (a prosecutor may robustly and vigorously argue the truthfulness of a witness whose credibility is under attack).

Likewise, a prosecutor may reply to remarks, comments or assertions made by defense counsel. *See United States v. Young*, 470 U.S. 1, 11–13 (1985) (when prosecutor's comments are an "invited reply" in response to defense counsel's own remarks, and the prosecutor "[does] no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction") (citations omitted).

"[T]he limits of proper argument find their source in notions of fairness, the same source from which flows the right to due process of law." *Houston v. Estelle*, 569 F.2d 372, 380 (5th Cir. 1978). Thus, to establish prosecutorial misconduct, a two-prong test must be satisfied: (1) the prosecutor's comments must have been improper; and (2) the comments must have prejudicially affected the substantial rights of the defendant. *See United States v. Wilson*, 149 F.3d 1298, 1301 (11th Cir. 1998); *Dessaure v. State*, 891 So. 2d 455, 464–65 (Fla. 2004) (an order granting mistrial is required only when the error upon which it rests is so prejudicial as to vitiate the entire trial, making a mistrial necessary to ensure that the defendant receives a fair trial). "A defendant's substantial rights are prejudicially affected

when a reasonable probability arises that, but for the remarks, the outcome of the trial would be different." *Wilson*, 149 F.3d at 1301 (internal quotations and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Eyster*, 948 F.2d at 1207.

With respect to a defense attorney's failure to object to a prosecutor's comments, "[a]n objectively reasonable trial lawyer could . . . prefer not to make objections during closing argument unless the objection is a strong one." *Holland v. Florida*, 775 F.3d 1294, 1317 (11th Cir. 2014) (internal quotation marks and citation omitted).

Here, the state court's assessment of both of prongs of the *Strickland* standard was reasonable. None of the comments identified by Profete was improper. Further, considering the ample evidence of Profete's guilt (most notably, E.B.'s trial testimony, the presence of his semen where E.B. told police it would be, and Profete's text messages), and considering the trial court's instructions to the jury to consider only the evidence and not the attorneys' comments (*see* App. B at 414–16, 456–59), the state court reasonably concluded Profete failed to show a reasonable probability the outcome of trial would have been different if defense had objected to the comments which Profete alleges were improper. Therefore, Profete is not entitled to federal habeas relief on Ground Eight.

I.    **Ground Nine:  "Counsel rendered ineffective assistance by failing to object to the erroneous jury instruction regarding consent of the victim where consent was not a defense in violation of the Defendants [sic] state and federal constitutional amendment provisional [sic] rights."**

Profete asserts the state court misinterpreted and/or misapplied *Strickland v. Washington*, 466 U.S. 668 (1984) in rejecting this claim during the Rule 3.850 proceeding and in his post-conviction appeal (*see* ECF No. 17 at 15–16; ECF No. 18 at 9–10).

The State concedes Profete exhausted this claim in the state courts (ECF No. 29 at 61).  The State contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of *Strickland* (*id.* at 62–65).

### 1.    Clearly Established Federal Law

The *Strickland* standard governs this IATC claim.

### 2.    Federal Review of State Court Decision

Profete presented Ground Nine as Ground Seven of his Rule 3.850 motion (App. M at 49–52).  Profete alleged the defense never presented a consent defense to the charges; therefore, there was no basis for a jury instruction on that defense. Profete alleged if defense counsel had objected to the jury instruction, the trial court probably would not have given it, and the result of trial would have been different.

The state circuit court adjudicated Profete's IATC claim as follows:

> The Defendant contends that his counsel was ineffective for failing to object to a jury instruction regarding the victim's consent "where consent was not a defense." This claim is without merit. Counsel was not ineffective for failing to object to standard jury instructions. Attachment 6. "[C]ounsel cannot be found ineffective for failing to object to instructions which had not been invalidated at the time of trial." Nixon v. State, 932 So. 2d 1009, 1016, n.6 (Fla. 2006). Even if Defense counsel had objected, the State would have been entitled to the instruction informing the jury that consent is not a defense to sexual battery of a minor by a person in custodial authority. In any event, the Defendant was not denied a fair trial as a result of the jury being given this accurate statement of the law. Lewis v. State, 693 So. 2d 1055, 1057 (Fla. 4th DCA 1997) (For an unnecessary instruction to constitute reversible error, it must, under the circumstances of the case, be capable of misleading the jury in such a way as to prejudice the Defendant's right to a fair trial.).

(App. M at 120–21). The First DCA affirmed the circuit court's decision without explanation (App. O).

This federal habeas court must defer to the state court's determination of the propriety of a jury instruction under state law. *See Herring*, 397 F.3d at 1355 ("It is a fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters." (internal quotation marks and citation omitted)). Accepting the state court's determination that the consent instruction was properly given, defense counsel was not deficient for failing to object to it, and there is no reasonable probability of a different outcome if counsel had objected.

Profete has not demonstrated that the state court's adjudication of Ground Nine was an unreasonable application of *Strickland*.  He is thus not entitled to relief on this claim.

**J.      Ground Ten:  "Counsel rendered ineffective assistance through the commission of cumulative errors in violation of the Defendants [sic] state and federal constitutional amendment provisional [sic] rights."**

Profete asserts the state court misinterpreted and/or misapplied *Strickland v. Washington*, 466 U.S. 668 (1984) in rejecting this claim during the Rule 3.850 proceeding and in his post-conviction appeal (*see* ECF No. 17 at 17; ECF No. 18 at 9–10).

The State concedes Profete exhausted this claim in the state courts (ECF No. 29 at 66).  The State contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of *Strickland* (*id.* at 66–68).

Profete presented this "cumulative error" claim as Ground Eight of his Rule 3.850 motion (App. M at 52–53).  He argued the cumulative effect of defense counsel's alleged errors, identified in Grounds One through Seven of his Rule 3.850 motion, deprived him of his Sixth Amendment right to effective assistance of counsel (*id.*).

The state circuit court adjudicated the claim as follows:

> Finally, the Defendant argues the cumulative effect of counsel's alleged errors denied him a fair trial. The Court finds the Defendant is not entitled to relief on this claim. "Where . . . the alleged errors urged for consideration in a cumulative error analysis are either meritless, procedurally barred, or do not meet the <u>Strickland</u> standard for ineffective assistance of counsel[,] . . . the contention of cumulative error is similarly without merit." <u>Bradley v. State</u>, 33 So. 3d 664, 684 (Fla. 2010) (citations omitted). Even considered cumulatively, the Defendant has not shown that he was deprived of a fair trial. <u>Michigan v. Tucker</u>, 417 U.S. 433, 446 (I974) ("[T]he law does not require that a defendant receive a perfect trial, only a fair one . . . .").

(App. M at 121). The First DCA affirmed this decision (App. O).

In rejecting a similar "cumulative error" argument made by a § 2254 habeas petitioner, the Eleventh Circuit stated: "The Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the context of an ineffective assistance of counsel claim." *Forrest v. Fla. Dep't of Corr.*, 342 F. App'x 560, 564 (11th Cir. 2009) (per curiam) (unpublished but cited as persuasive authority). The *Forrest* panel further noted "[h]owever, the Supreme Court has held, in the context of an ineffective assistance claim, that 'there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.'" *Id.* at 564–65 (quoting *United States v. Cronic*, 466 U.S. 648, 659 n.26 (1984)).

Considering *Cronic* and the absence of Supreme Court precedent applying the "cumulative error" doctrine to claims of ineffective assistance of counsel, the state court's rejection of Profete's claim was not contrary to or an unreasonable application of clearly established federal law.  *See Wright v. Van Patten,* 552 U.S. 120, 126  (2008) ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established federal law."); *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1287–88 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law."); *see also Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (refusing to decide whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law).

Moreover, as previously discussed, "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Cronic*, 466 U.S. at 659

n.26. Where there is no actual error, the "cumulative error" claim has no merit. *See Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014) (citing *Morris*, 677 F.3d at 1132).

As discussed *supra*, Profete failed to show any constitutional error with respect to defense counsel's assistance. In the absence of any actual error, Profete's "cumulative error" claim has no merit.

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting § 2253(c)(2)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists

could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537 U.S. at 327).   The petitioner here cannot make that showing.   Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That the amended petition for writ of habeas corpus (ECF No. 17) be **DENIED**.

2.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 8th day of September 2020.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**